**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| COREY BRISKIN and NICHOLAS MAGGIPINTO, on behalf of themselves and all others similarly situated,<br><br>                      Plaintiffs,<br><br>             v.<br><br>CITY OF NEW YORK, ERIC L. ADAMS, *individually and in his official capacity as the Mayor of the City of New York*, RENEE CAMPION, *individually and in her official capacity as the Commissioner of the Office of Labor Relations of the City of New York*, BILL DE BLASIO, and ROBERT LINN,<br><br>                  Defendants. | **CLASS ACTION COMPLAINT**<br><br>Jury Trial Demanded<br><br>Case No. 24-cv-3557 |

       Plaintiffs Corey Briskin and Nicholas Maggipinto (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, allege as follows against the City of New York; Eric L. Adams, individually and in his official capacity as Mayor of the City of New York; Renee Campion, individually and in her official capacity as Commissioner of the Office of Labor Relations of the City of New York ("OLR"); Bill de Blasio, former Mayor of the City of New York; and Robert Linn, former OLR Commissioner (collectively, "Defendants"):

**INTRODUCTION**

       1.     The City of New York ("City") offers valuable healthcare benefits to more than 300,000 City employees and their qualified dependents through the New York City Health Benefit Program (the "healthcare plan"). Through its healthcare plan, the City of New York provides access to in vitro fertilization ("IVF") that enables City employees and their partners to grow their families with biological children when their circumstances prevent conception through traditional

means.[1]  For thousands of gay men who have worked for the City and their partners[2]—including Corey Briskin and Nicholas Maggipinto—IVF is the only feasible way to conceive a child.

2.      The City's healthcare plan has long provided IVF benefits to male and female employees and their partners in different-sex relationships, as well as single women and women in same-sex relationships. But the City's healthcare plan has categorically excluded gay male employees and their partners from receiving IVF benefits under the plan.

3.      Gay men like Mr. Briskin and Mr. Maggipinto who wish to have biological children have no path to do so without IVF. This makes them similarly situated to men and women in different-sex relationships and women in same-sex relationships who need IVF to conceive a biological child.[3] By denying gay men access to IVF—principally the retrieval and fertilization of eggs—the City of New York, Mayor Eric L. Adams, and other City leaders have unlawfully discriminated against gay male City employees and their partners in violation of federal, state, and local anti-discrimination laws, as well as the Equal Protection and Due Process Clauses of the United States and New York Constitutions.

4.      The City of New York has categorically denied IVF benefits to gay men by disqualifying employees and their partners from receiving IVF benefits unless they are "infertile," which the City defines as the inability to conceive a child through *male-female* unprotected sexual

---

[1] IVF refers to a medical procedure in which an egg is combined with sperm in a laboratory setting with the objective of creating fertilized human embryos for later use in a pregnancy.

[2] As used throughout this Complaint, references to "employees" of the City of New York include both current and former employees. Where the context allows, "employees" is intended to include employees of the City of New York and those employees' dependents, including but not limited to employees' spouses, who are eligible to participate in the City of New York's healthcare plan.

[3] Indeed, IVF has been recognized for the indispensable role it plays when procreation otherwise would be biologically impossible, so much so that New York now *mandates* that employers—including the City of New York—provide their employees and their dependents access to IVF (with few exceptions not applicable here). *See* N.Y. Ins. L. §§ 3221(k)(6)(C), 4303(s)(3).

intercourse in a consecutive 12-month period or through intrauterine insemination ("IUI"). Under this definition, a woman who is unable to conceive with her male partner after 12 months of unprotected sexual intercourse is considered "infertile" and qualifies for IVF under the City's healthcare plan. Likewise, a single woman or a woman with a female partner, who like a single gay man or a gay man in a same-sex relationship is unable to conceive through sexual intercourse, can qualify for IVF using an alternative route—by undergoing IUI without a resulting pregnancy. But gay men, although equally incapable of conceiving a child without IVF, are *always* denied access to IVF under the City's healthcare plan.

5.      By defining "infertility" in this exclusionary manner, single female employees, female employees with male partners, female employees with female partners, and male employees with female partners are *always* potentially eligible for some IVF benefits under the City's healthcare plan, but gay male employees—whether individually or with male partners—are *never* eligible for any IVF benefits. As a result, the City of New York, through its healthcare plan, treats gay men worse than similarly situated women (whether they are single or in different-sex or same-sex relationships) and worse than similarly situated men in different-sex relationships. Accordingly, the City's healthcare plan denies gay men equal treatment and makes it much harder for gay men to have biological children than other employees and their partners.

6.      For example, when a male employee and his female partner are both covered by the City's healthcare plan and the female partner cannot produce viable eggs, the City will cover the cost of fertilizing the eggs obtained by the couple from a female donor using the male employee's sperm. Likewise, when a male employee's female partner is *not* covered by the City's healthcare plan but is capable of producing viable eggs, the City will cover the cost of fertilizing the female partner's eggs using the male employee's sperm if the couple uses its own resources to retrieve eggs from the female partner. In contrast, when a gay male employee like Mr. Briskin

3

obtains eggs from a female donor because his partner cannot produce viable eggs, the City's healthcare plan offers Mr. Briskin no IVF benefits and will not cover the cost of fertilizing the donated eggs using his sperm. In this scenario, the only difference between Mr. Briskin and the male employee in a different-sex relationship who receives IVF coverage is Mr. Briskin's sexual orientation.

7.      The City of New York's IVF policy is not just about the provision of specific healthcare benefits to City employees. More broadly, it's a policy of encouraging and assisting City employees to conceive children and grow their families. Many large employers have policies that help their employees grow their families. But when employers like the City of New York provide family building benefits to their employees, they cannot offer these benefits to all employees *except* gay men, particularly since gay men are more likely than any other group to need those benefits to grow their families biologically.

8.      Plaintiff Corey Briskin, who worked for the City of New York from 2017 to 2022 as an Assistant District Attorney in Manhattan, and his husband Nicholas Maggipinto are among the thousands of gay men who have been deprived of IVF and family-building benefits because of the City's discriminatory policy. For nearly a decade, Mr. Briskin and Mr. Maggipinto have been eager to grow their family through the conception of biological children. But when insurance does not cover IVF, the out-of-pocket costs for IVF can be tens of thousands of dollars for a single cycle. For Mr. Briskin, Mr. Maggipinto, and so many other gay male employees and their partners, the City's discriminatory policy and the concomitant high cost of IVF have prevented them from conceiving children in the same way that all other City employees are eligible to conceive.

9.      The City of New York's denial of IVF benefits to gay men has prevented gay male employees and their qualified dependent partners from expanding their families with biological children. If these gay men had been a different sex or a different sexual orientation, the City would

have offered them valuable IVF benefits to help them have biological children and grow their families, just like other City employees.

10.     The City of New York and its leaders have long known that they have an obligation not to discriminate against gay men under federal, state, and local law, but they have disregarded that obligation when it comes to offering IVF benefits to City employees.

11.     In 2020, the United States Supreme Court affirmed that discrimination in the terms, conditions, and privileges of employment based on sex violates Title VII of the Civil Rights Act of 1964 *and* that discrimination based on an employee's sexual orientation is an unlawful form of sex discrimination. *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 662 (2020). In *Bostock*, the Supreme Court based its conclusion on "the straightforward application of [a] legal term[]"—"sex"—that has a "plain and settled meaning[]." *Id.* at 662-64. Such discrimination "has always been prohibited by Title VII's plain terms," as confirmed by the Supreme Court's prior decisions in *City of L.A. Department of Water & Power v. Manhart*, 435 U.S. 702, 711 (1978), and *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 79 (1998), among others. *Bostock*, 590 U.S. at 662-64. Of course, *Bostock* only enshrined in federal law what the City of New York had previously established *almost 40 years earlier* when the City expressly banned discrimination in employment based on sexual orientation, N.Y.C. Admin. Code § 8-107(1)(a) (1986), and what New York recognized under state law *over two decades ago*. *See* N.Y. Exec. Law §§ 291(1), 296(1) (2003).

12.     During the past year, two federal courts have held that a healthcare plan that excludes same-sex couples from receiving IVF benefits or that imposes greater costs or challenges on same-sex couples to obtain IVF than other persons may constitute unlawful sex and sexual orientation discrimination under federal civil rights laws. *See Murphy v. Health Care Serv. Corp.*, No. 22 Civ. 2656, 2023 WL 6847105, at *3-4 (N.D. Ill. Oct. 17, 2023); *Berton v. Aetna Inc.*, No. 23 Civ. 01849, 2024 WL 869651, at *4 (N.D. Cal. Feb. 29, 2024).

13.     In this case, the City of New York has not just made it harder for gay men like Mr. Briskin and Mr. Maggipinto to qualify for IVF benefits, the City has made it impossible for gay men to qualify for IVF benefits. As a result, the City of New York has engaged in unlawful sex and sexual orientation discrimination that violates federal, state, and local law.

14.     Mr. Briskin and Mr. Maggipinto have repeatedly asked the City of New York to treat them equally and to reform the City's policy so that *all* City employees and their partners are treated equally in accessing IVF benefits and building their families. Because the City of New York has repeatedly refused to guarantee them and other gay men equal treatment, Mr. Briskin and Mr. Maggipinto are bringing this class action lawsuit to demand justice for themselves and all other gay male employees and their partners who have been harmed and continue to be harmed by the City's discriminatory policy.

15.     The City of New York has repeatedly suggested that Mr. Briskin and Mr. Maggipinto are asking the City to provide IVF benefits to surrogates even though the City's healthcare plan does not cover any IVF benefits provided to surrogates. The City's claim is baseless. In this action, as in their charge before the Equal Employment Opportunity Commission ("EEOC"), Mr. Briskin and Mr. Maggipinto do not argue that the City of New York must provide *any* benefits to surrogates, such as the implantation of embryos. Instead, they are merely asking the City to provide them and other gay men the same types of IVF and family building benefits that all other employees receive, such as the retrieval and fertilization of eggs using their sperm.

## PARTIES

16.     Corey Briskin is a resident of Kings County, New York, and at all relevant times has resided in New York City. Mr. Briskin was employed by the City of New York from 2017 to 2022 as an Assistant District Attorney in the New York County District Attorney's Office. During his employment with the City of New York and continuing after his resignation from his

appointment in February 2022 through COBRA coverage, Mr. Briskin has participated in the City of New York's healthcare plan and has received healthcare benefits through the GHI Comprehensive Benefits Plan for City employees, which is managed by Emblem Health. Mr. Briskin, a gay man, is married to Nicholas Maggipinto, another gay man, who was covered by the City's healthcare plan during Mr. Briskin's employment with the City as a qualified dependent.

17.     Nicholas Maggipinto is a resident of Kings County, New York, and at all relevant times has resided in New York City. Mr. Maggipinto, a gay man, was covered by the City of New York's healthcare plan from 2017 through March 2022 as a covered dependent of his husband, Corey Briskin, during Mr. Briskin's employment with the City of New York.

18.     The City of New York is a municipal corporation duly incorporated pursuant to the laws of the State of New York. Both the New York County District Attorney's Office and the Office of Labor Relations are instrumentalities of the City of New York.

19.     Eric L. Adams is the current Mayor of the City of New York and has served in that capacity since January 1, 2022. As mayor, Defendant Adams is the chief executive officer of the City of New York, and in that capacity Defendant Adams is responsible for setting citywide policy, including the City of New York's policy by which its healthcare plan unlawfully denies IVF benefits to gay men.

20.     Renee Campion is the current Commissioner of OLR and has served in that capacity since 2019. As Commissioner of OLR, which is responsible for administering the City of New York's healthcare plan, Defendant Campion is directly in charge of the City's healthcare plan. Campion, in conjunction with the Mayor of the City of New York, is responsible for the City of New York's policy by which its healthcare plan unlawfully denies IVF benefits to gay men.

21.     Bill de Blasio was the Mayor of the City of New York from January 1, 2014 to December 31, 2021. During his tenure as mayor, Defendant de Blasio was the chief executive

officer of the City of New York, and in that capacity Defendant de Blasio was responsible for setting citywide policy, including the City of New York's policy by which its healthcare plan, for the duration of Defendant de Blasio's tenure as mayor, unlawfully denied IVF benefits to gay men.

22.     Robert Linn was the Commissioner of OLR from 2014 to 2019. During his tenure as the Commissioner of OLR, Defendant Linn was directly in charge of the City's healthcare plan. Defendant Linn, in conjunction with the former Mayor of the City of New York, was responsible for the City of New York's policy by which its healthcare plan unlawfully denied IVF benefits to gay men.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert constitutional claims under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, and federal statutory claims under Title VII of the federal Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*

24.     There is supplemental jurisdiction over the state and city law claims asserted in this action pursuant to 28 U.S.C. § 1367(a), because Plaintiffs' claims under the New York State and City Human Rights Laws and the New York State Constitution are so related to the Title VII and federal constitutional claims in this action that they form part of the same case or controversy.

25.     There is personal jurisdiction over Defendants because the City of New York resides in this District, because Plaintiffs Corey Briskin and Nicholas Maggipinto were denied health insurance benefits by Defendants in this District, and because Defendants' discriminatory decision- and policy-making regarding the City's healthcare plan has taken place in this District.

26.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this District, where the City of New York's headquarters are located.

27. On April 12, 2022, Mr. Briskin and Mr. Maggipinto filed a charge of discrimination with the EEOC on behalf of themselves and similarly situated gay males who have been denied IVF benefits due to the City of New York's policy or practice of denying IVF benefits to gay males. On March 7, 2024, the Department of Justice issued a right to sue letter, which is attached as Exhibit A.

## FACTUAL BACKGROUND

**A. In Vitro Fertilization is Critical for Many Families to Conceive Children, Especially Gay Male Families.**

28. Infertility is not only a disease that prevents a person from achieving a successful pregnancy, but also a condition or status in which a person requires medical intervention—including donor gametes (such as eggs or sperm) or embryos—to achieve a successful pregnancy with or without a partner.

29. The American Society for Reproductive Medicine ("ASRM"), which has long served as the leading authority on reproductive medicine for every level of government, defines "infertility" as follows:

"Infertility" is a disease, condition, or status characterized by any of the following:

- The inability to achieve a successful pregnancy based on a patient's medical, sexual, and reproductive history, age, physical findings, diagnostic testing, or any combination of those factors.

- The need for medical intervention, including, but not limited to, the use of donor gametes or donor embryos in order to achieve a successful pregnancy either as an individual or with a partner.[4]

30. Under this definition of infertility, *all* gay men and lesbians, whether single or in same-sex couples, qualify as infertile because they need donated eggs or sperm from someone other

---

[4] American Society for Reproductive Medicine, Definition of infertility: a committee opinion (2023), https://www.asrm.org/globalassets/_asrm/practice-guidance/practice-guidelines/pdf/definition-of-infertility.pdf.

than their same-sex partner to achieve a successful pregnancy. That is because men do not produce eggs and women do not produce sperm.

31. Several states have expressly adopted definitions of infertility that are inclusive of gay men and lesbians and are consistent with the ASRM's definition of infertility. And Aetna, a health insurance company that covers tens of millions of Americans, recently announced that it will apply ASRM's inclusive definition of infertility.

32. Infertility—that is, the need for medical intervention, including the use of donor gametes, in order to achieve a successful pregnancy—is not just a challenge for gay and lesbian Americans. Rather, it is a common problem for people of all sexual orientations and genders, with one in eight American couples confronting challenges in conceiving a child.

33. To address fertility issues, Americans are increasingly using Assisted Reproductive Technology ("ART") to conceive children and grow their families. As the Centers for Disease Control and Prevention ("CDC") explains, "Assisted Reproductive Technology (ART) includes all fertility treatments in which either eggs or embryos are handled outside of the body. In general, ART procedures involve removing mature eggs from a woman's ovaries using a needle, combining the eggs with sperm in the laboratory, and returning the embryos to the woman's body or donating them to another woman. The main type of ART is in vitro fertilization (IVF)."[5]

34. There are generally three steps in the IVF process. First, mature eggs are collected from the ovaries of a woman who has taken medication to stimulate her ovaries to increase her egg

---

[5] Centers for Disease Control and Prevention, Infertility FAQs: What is assisted reproductive technology (ART)?, https://www.cdc.gov/reproductivehealth/infertility/index.htm#:~:text=In%20the%20United%20States%2C%20among,to%20term%20(impaired%20fecundity).

production.[6] Eggs may be retrieved from a woman seeking to have a child or from an egg donor. Second, eggs are fertilized in a laboratory with sperm. Third, fertilized eggs that have matured, called embryos, are transferred into a woman's uterus where, if implantation occurs, an embryo may develop into a fetus. In some cases, embryos are transferred into the uterus of the woman who will carry the pregnancy and be a parent, and in others, embryos are transferred into the uterus of a gestational carrier, also known as a surrogate, who is carrying the pregnancy on behalf of an intended parent or parents.

35.     IVF is an effective remedy for couples—whether different-sex or same-sex—who cannot conceive biologically through intercourse. On average, IVF results in a live birth 44.5% of the time for persons under 35 years old, and the IVF success rate is usually higher when donor eggs are used.[7]

36.     Same-sex couples face unique challenges in building their families because they cannot conceive through sexual intercourse. Thankfully, the modern marvel of ART has made the dream of building a family one step closer to reality for same-sex couples.

37.     For different-sex couples attempting to conceive a child biologically, ART, including IVF, is typically not available to them unless they have unsuccessfully attempted to achieve a pregnancy through unprotected sexual intercourse for a one-year period.

---

[6] While this Complaint refers to women or females as shorthand for people with uteruses and ovaries, we recognize that some non-binary people and/or transgender men have uteruses and are capable of giving birth.

[7] Becca Stanek, *IVF Success Rates By Age In 2024*, Forbes (Sept. 18, 2023), https://www.forbes.com/health/family/ivf-success-rates-by-age/ (citing Preliminary National Summary Report for 2021, Society for Assisted Reproductive Technology, https://sartcorsonline.com/CSR/PublicSnapshotReport?ClinicPKID=0&reportingYear=2021).

38.     When a single woman or a same-sex female couple seeks to conceive a child biologically, typically they are required to attempt conception through intrauterine insemination ("IUI") before resorting to IVF. IUI, also known as artificial insemination, is a medical procedure in which sperm is inserted directly into the uterus of a person wishing to become pregnant, sometimes in conjunction with medicines that stimulate ovulation. Generally, after three unsuccessful attempts to conceive through IUI, the likelihood is low that successive attempts will produce a pregnancy.

39.     In contrast to single women and same-sex female couples, gay men have only one realistic path to conceive a child biologically: through IVF, where an embryologist creates embryos using the men's sperm and eggs from a female donor. There is no reasonable alternative to IVF for gay men seeking to conceive biological children.

40.     Although IVF is very effective, it is expensive. A single IVF cycle can cost tens of thousands of dollars, and multiple IVF cycles are often required to achieve a pregnancy.

41.     When benefits are not available from an employer or a healthcare plan to cover the cost of IVF for people who are unable to conceive through male-female sexual intercourse, that substantial financial burden ordinarily forecloses their opportunity ever to have biological children. Recognizing that the substantial cost of IVF should not prevent workers from having biological children, the legislatures of numerous states, including New York, have enacted laws designed to ensure broad access to IVF by requiring large healthcare plans to cover the cost of IVF.[8] And recognizing that same-sex couples face a particularly costly path to becoming biological parents,

---

[8] *See, e.g.*, N.Y. Ins. L. §§ 3216(13), 3221; 215 Ill. Comp. Stat. 5/356m; Conn. Gen. Stat. §§ 38a-509, 38a-536 (2024); D.C. Code § 31-3834.06 (2024) (eff. Jan. 1, 2025); Colo. Rev. Stat. § 10-16-104 (2023).

the New York State Legislature prohibited denying access to IVF based on, among other factors, sexual orientation. *See* N.Y. Ins. L. § 3221(k)(6)(C)(viii).

**B. The City of New York's IVF Policy Categorically Excludes Gay Men and Their Partners from Receiving IVF Benefits, While Providing IVF Benefits to Single Women, Women in Same-Sex and Different-Sex Relationships, and Men in Different-Sex Relationships.**

42.     The City of New York is one of the largest employers in the United States, having employed over 300,000 full-time employees and about 25,000 part-time employees annually in recent years.[9] Those full-time employees include teachers, police officers, fire fighters, nurses, doctors, social workers, sanitation workers, and lawyers, to name some of the largest categories of personnel. The largest agencies of the City of New York are the Department of Education, the Police Department, the Health and Hospitals Corporation, the Fire Department, and the Human Resources Administration.[10]

43.     Most employees of the City of New York earn modest salaries relative to the cost of living in New York City. In fiscal year 2021, the median salary of City employees was $80,440,[11] even though New York City is one of the most expensive places to live in the United States.[12]

44.     Full-time City of New York employees receive healthcare benefits as one of their key employment benefits. And the qualified spouses and other dependents of City employees

---

[9] Samar Skurshid, *Facing Depleted Agencies, New York City Government Plans to Add 25,000 More Employees by June 2023*, Gotham Gazette (Nov. 17, 2022), https://www.gothamgazette.com/city/11693-vacancies-nyc-government-hiring-25000-june-2023-budget-mayor-adams.

[10] *Take a peek at the largest city government agencies, Ranked by number of employees*, Crain's New York Business (June 2, 2020), https://www.crainsnewyork.com/gallery/list/take-peek-largest-city-government-agencies.

[11] NYC DCAS Citywide Administrative Services, NYC Government Workforce Profile Report, Fiscal Year 2021 at 3 (2021), https://www.nyc.gov/assets/dcas/downloads/pdf/reports/nyc-government-workforce-profile-report-fy-2021.pdf.

[12] Mike Winters, *The 15 U.S. cities with the highest cost of living—San Francisco isn't No. 1*, CNBC https://www.cnbc.com/2023/08/22/us-cities-with-the-highest-cost-of-living.html.

(including retired employees and former employees receiving benefits through COBRA) are similarly eligible for healthcare benefits. For each participant in the City's healthcare plan, the economic value of the healthcare benefits the City provides can be tens of thousands of dollars per year, and even hundreds of thousands of dollars in cases of more serious medical conditions or diseases.

45.     In 2021, approximately 1.25 million employees, retired employees, and qualified dependents were covered by the City of New York's healthcare plan.[13]

46.     The primary option for medical-care coverage that the City of New York offers its employees is the EmblemHealth Comprehensive Benefit Plan ("CBP"), which is underwritten by Group Health Incorporated ("GHI").

47.     The City of New York's healthcare plan, through CBP and otherwise, provides a range of fertility-related benefits. For example, through CBP the City of New York's healthcare plan will pay 75 percent of the cost of a variety of fertility-related benefits, including IVF (as well as the laboratory tests and procedures done in connection with IVF); cryo-preservation of embryos for later use in implantation; preparation of a cryo-preserved embryo for use in implantation; and transfer of an embryo to the uterus of a gestational carrier.[14]

---

[13] Barbara Caress, *New York City Over-Pays for Health Insurance. City Workers Still Get a Bad Deal*, Center for New York City Affairs (Jan. 20, 2021), http://www.centernyc.org/urban-matters-2/2021/1/20/new-york-city-over-pays-for-health-insurance-city-workers-still-get-a-bad-deal.

[14] CBP will pay 75% of the "[s]chedule or negotiated rate" for IVF treatment from participating providers and covers 75% of the "allowed charge" for plan participants who receive IVF treatment from non-participating providers. Moreover, for certain management-level employees like Mr. Briskin who receive supplemental benefits from the Management Benefits Plan ("MBP"), another component of the City of New York's healthcare plan, the healthcare plan covers even more than 75% of the cost for these services and, in some cases, covers more than 95% of the cost.

48.     Under the City's healthcare plan, IVF is available only to an employee or another plan participant diagnosed with "infertility." As described in CBP's Certificate of Insurance and Rider ("Certificate of Insurance"), "[i]nfertility is defined as the inability to conceive after twelve (12) months of unprotected intercourse."[15] Although "unprotected intercourse" is not defined in the Certificate of Insurance, the City of New York has interpreted "unprotected intercourse" to refer solely to unprotected male-female intercourse. As a result, males in same-sex relationships can *never* be diagnosed with infertility even though they, like different-sex couples diagnosed with infertility, are unable to conceive through unprotected intercourse.

49.     For different-sex couples to show that they are infertile and thus qualify for IVF benefits under the City's healthcare plan, they need to have unprotected intercourse for 12 months without conceiving and then undergo four months of an infertility treatment that is less invasive than IVF.

50.     Single women and same-sex female couples can show that they are infertile and qualify for IVF under the City's healthcare plan if they undergo six months of certain infertility procedures without conceiving, namely three cycles of unstimulated IUI and three cycles of stimulated IUI. When a woman can produce a viable egg but requires IVF to conceive a child biologically, the City's healthcare plan covers the cost of retrieving eggs from her ovaries and fertilizing them in a laboratory to create embryos—either with sperm from a donor or sperm from her male partner. Furthermore, the City's healthcare plan will provide IVF benefits to a female employee using a surrogate to carry fertilized embryos for the female employee, including covering the retrieval and fertilization of the female employee's eggs.

---

[15] City of New York Employees and Retirees Health Insurance for You and Your Dependents at 95, https://www.emblemhealth.com/content/dam/emblemhealth/pdfs/resources/cny/ghi-cbp/EmblemHealth-GHI-CBP-NYC-Certificate-of-Insurance.pdf.

51.     In contrast to the benefits offered to single women, women in different-sex or same-sex relationships, and men in different-sex relationships, the City's healthcare plan does not offer any route to IVF benefits for gay men because they cannot show that they are infertile under the City's standards. This is true even though IVF is the only way that gay men can conceive a biological child. Unlike different-sex couples, same-sex male couples cannot conceive through sexual intercourse with each other or through IUI. Unlike same-sex female couples and single women, same-sex male couples and single gay men cannot conceive through IUI.

52.     Though gay men—whether in same-sex couples or single—are similarly situated to different-sex couples, same-sex female couples, and single women, the City of New York categorically excludes gay men from IVF benefits while offering those benefits to others. Consequently, the City of New York treats gay men worse under the City's healthcare plan because they are men and because they are gay.

53.     One common scenario illustrates how gay men are denied access to IVF under the City's healthcare plan based on their sex and/or sexual orientation: when a City employee who is male *and* a plan participant seeks access to IVF in conjunction with his female partner who is *not* a plan participant, the City's healthcare plan covers IVF, including fertilizing eggs collected from the female partner using the sperm of the male employee/plan participant.

54.     In contrast, for a gay male employee like Mr. Briskin, who is a plan participant, the City's healthcare plan does not cover the cost of fertilizing eggs obtained from a non-plan participant woman using Mr. Briskin's sperm. The same was true for Mr. Maggipinto when he was a plan participant: the City's healthcare plan would not cover the cost of fertilizing a non-plan participant woman's eggs using Mr. Maggipinto's sperm.

55.     Accordingly, when eggs are retrieved from a woman who is not a plan participant, the City's healthcare plan will cover the cost of fertilizing the eggs for a man with a female partner

but will not cover the cost of fertilizing the eggs for a gay man with a male partner. Despite being identically situated in this situation, the gay male plan participant with a male partner is denied the same IVF benefits that are provided to the male plan participant with a female partner.

56.    Similarly, when both members of a different-sex couple are plan participants but the female partner cannot produce viable eggs, the City's healthcare plan will cover the cost of fertilizing eggs obtained from a donor using the male plan participant's sperm. In this scenario, the male plan participant in a different-sex relationship is similarly situated to Mr. Briskin, Mr. Maggipinto, and other gay male plan participants in that none of their partners can produce viable eggs, they obtain eggs from a donor, and those donated eggs are fertilized using their sperm. But unlike the male plan participant in a different-sex relationship who receives coverage for the egg fertilization under the City's healthcare plan, Mr. Briskin, Mr. Maggipinto, and other gay male plan participants receive no coverage for egg fertilization under the City's healthcare plan.

57.    There is no legitimate, non-discriminatory explanation for why the City's healthcare plan offers IVF benefits when the male plan participant's partner is female but withholds IVF benefits when the male plan participant's partner is male. The same male plan participant seeking access to IVF under the City's healthcare plan receives different coverage based on the sex of his partner and his sexual orientation. Accordingly, the City of New York makes determinations about IVF benefits for men based on the sex of their partners and based on their sexual orientation. By denying gay male employees IVF benefits on the basis of their sex and sexual orientation, the City of New York treats gay men less well than their non-gay counterparts and therefore unlawfully discriminates against gay men.

**C. Corey Briskin and Nicholas Maggipinto Were Denied IVF Benefits Under the City's Healthcare Plan Because They Are Men and Because They Are Gay.**

58.    In 2011, New York State enacted the Marriage Equality Act, legalizing same-sex marriage.

59.    In 2013, the U.S. Supreme Court struck down the federal Defense of Marriage Act's definition of marriage that excluded same-sex couples, *United States v. Windsor*, 570 U.S. 744, 775 (2013), and in 2015 the Supreme Court held that states could not prohibit marriage between people of the same sex. *Obergefell v. Hodges*, 576 U.S. 644, 675 (2015).

60.    In 2016, Mr. Briskin and Mr. Maggipinto were married in the City and State of New York.

61.    In 2017, Mr. Briskin began working as an Assistant District Attorney in the New York County District Attorney's Office, and he remained in that position until January 2022.

62.    From 2017 until March 2022, both Mr. Briskin, as a covered employee, and his husband Mr. Maggipinto, as a qualified dependent, were enrolled in the City of New York's healthcare plan, and more specifically, in CBP and MBF.

63.    In January 2022, Mr. Briskin left the District Attorney's Office to serve as a law clerk to a federal judge but he retained the benefits provided under the City's healthcare plan through CBP and MBF by invoking his COBRA rights and paying the full cost of the premium. Mr. Briskin remains enrolled in the City's healthcare plan through the CBP and MBF today.

64.    Similarly, Mr. Maggipinto retained the benefits provided under the City's healthcare plan through MBF by invoking his COBRA rights and paying the full cost of the premium. Mr. Maggipinto remains enrolled in the City's healthcare plan through MBF today.

65.     In 2017, Mr. Briskin and Mr. Maggipinto decided to expand their family and hoped to conceive at least two biological children. Because they are gay men in a same-sex relationship, however, their only option for conceiving biological children of their own is to rely on IVF.

66.     Mr. Briskin and Mr. Maggipinto were elated that the City's healthcare plan covered IVF because they could not afford the substantial expense of this indispensable healthcare without receiving benefits under the City's healthcare plan. However, to their dismay, Mr. Briskin and Mr. Maggipinto soon learned that the City's healthcare plan would not cover any IVF-related services or benefits for them because they are gay men, even though it would cover up to three rounds of IVF for similarly situated individuals who are not gay men but otherwise could not conceive without IVF.

67.     Because of the City of New York's policy or practice of denying IVF to gay men, including men in same-sex male couples, Mr. Briskin and Mr. Maggipinto were forced to delay the process of conceiving children and growing their family for over five years.

68.     In 2021, Mr. Briskin and Mr. Maggipinto remained eager to grow their family. They were hopeful that the City's healthcare plan would cover IVF for same-sex male couples because in 2020 New York State had mandated that healthcare plans with over 100 employees provide at least three IVF cycles to every plan participant and that IVF access could not be denied based on sex or sexual orientation. In addition, other major employers had begun to provide access to IVF for their gay male employees. For example, in 2020 Deutsche Bank announced that it would provide up to $50,000 of IVF benefits for gay male employees and other employees who conceive

a child using a surrogate so that that all employees would have equal access to IVF and other family planning benefits.[16]

69.     In 2021, Mr. Briskin contacted the City of New York's Office of Labor Relations and a human resources representative in the New York County District Attorney's Office to request coverage for IVF under the City's healthcare plan. Both times, Mr. Briskin was told that neither he nor his husband, Mr. Maggipinto, was eligible for any IVF coverage under the City's healthcare plan, including for the retrieval and fertilization of eggs in a laboratory using their own sperm.

70.     Next, Mr. Briskin contacted the New York City Corporation Counsel, the agency that represents the City of New York in legal disputes, to express his concern that the City of New York had denied his request for IVF coverage and to complain about the City's policy that discriminates against gay men based on sex and sexual orientation by categorically denying IVF coverage to gay men.

71.     Mr. Briskin asked the Corporation Counsel to change the City of New York's policy so that all gay men, including gay men like him in same-sex relationships, can receive equal access to IVF in order to comply with federal, state, and city anti-discrimination laws. The City of New York denied this request, too. At that time, Corporation Counsel stated that the decision of whether to provide gay men like Mr. Briskin and Mr. Maggipinto equal access to IVF as other City employees and their partners would be made by the Mayor of the City of New York (then Bill de Blasio) in conjunction with Corporation Counsel.

---

[16] *See* Deutsche Bank, Deutsche Bank Increases Family Planning Benefits (Dec. 18, 2020), https://www.db.com/news/detail/20201218-deutsche-bank-increases-family-planning-benefits?language_id=1.

72.     In the fall of 2021 and throughout 2022, Mr. Briskin and Mr. Maggipinto grew increasingly eager to start their family and wished they could access IVF through the City's healthcare plan to do so. But because the City's healthcare plan did not provide access to IVF to same-sex male couples, they could not afford IVF and therefore could not begin to grow their family as they had planned.

73.     On April 12, 2022, Mr. Briskin and Mr. Maggipinto filed a sex and sexual orientation class action discrimination charge against the City of New York with the EEOC, asserting claims under Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and the New York City Human Rights Law. The Mayor of the City of New York at the time, Eric L. Adams, publicly acknowledged the charge that Mr. Briskin and Mr. Maggipinto had filed, including their claim that the City of New York had a policy against providing same-sex male couples like them with equal access to IVF. But the Mayor refused to change the City of New York's policy. In fact, the City of New York's lawyers, acting at the direction of Mayor Adams, defended the discriminatory policy in a position statement submitted to the EEOC in May 2022.

74.     In its position statement to the EEOC, the City of New York did not deny that its healthcare plan categorically denied IVF-related benefits to Mr. Briskin, Mr. Maggipinto, and other gay men otherwise eligible for benefits under the City's healthcare plan. Rather, in an attempt to justify its discriminatory policy, the City of New York claimed that Mr. Briskin and Mr. Maggipinto were ineligible for any IVF benefits because the plan does not provide benefits to "surrogates." However, Mr. Briskin and Mr. Maggipinto's charge had made clear that they were not seeking reimbursement for *any* services provided to a surrogate and that they simply wanted coverage for the same IVF services that the City's healthcare plan provided to other similarly situated individuals and couples, such as egg retrieval and fertilization in a laboratory.

75.     Importantly, as the EEOC learned through its investigation of Mr. Briskin and Mr. Maggipinto's charge, the City's healthcare plan *does* provide access to IVF—including egg retrieval and fertilization—to women and non-gay men with different-sex partners whose fertilized embryos are carried by a surrogate.

76.     In 2023, Mr. Briskin and Mr. Maggipinto finally were able to take the first steps in growing their family, notwithstanding the City of New York's continued refusal to provide them with IVF benefits based on their sex and sexual orientation. In December 2023, a doctor retrieved eggs from a donor and fertilized them in a laboratory, in some cases using Mr. Briskin's sperm and in others using Mr. Maggipinto's sperm. Mr. Briskin and Mr. Maggipinto are hopeful that later this year, those embryos will be transferred to the uterus of a surrogate, who will become pregnant and carry the pregnancy to term.

77.     Because of the City's policy or practice of denying IVF benefits to same-sex male couples, Mr. Briskin and Mr. Maggipinto did not receive any coverage or reimbursement from the City's healthcare plan for IVF, including for the stimulating medications needed for the egg retrieval, the egg retrieval, and the fertilization of the eggs in a laboratory, all of which similarly situated women and men in different-sex relationships routinely receive. As a result, Mr. Briskin and Mr. Maggipinto were denied tens of thousands of dollars of IVF benefits that similarly situated persons have routinely received, and that denial was due to their sex and sexual orientation.

**D. All Gay Male Employees and Their Gay Male Partners Have Been Denied IVF Benefits by the City.**

78.     Over the past several years, Plaintiffs estimate that hundreds and possibly thousands of other same-sex male City employees and their gay male covered partners have been denied access to IVF by the City of New York in the same way that Mr. Briskin and Mr. Maggipinto have been denied IVF by the City, all while the City of New York has routinely provided single women,

women in different-sex or same-sex relationships, and men in different-sex relationships with full access to IVF under the City's healthcare plan.

79.     Like Mr. Briskin and Mr. Maggipinto, many same-sex male couples have delayed or have had to forego conceiving biological children of their own because of the City of New York's policy or practice of denying IVF benefits to gay men, including those in same-sex relationships. And many gay male couples who have forged ahead with IVF despite the City of New York's pattern or practice of denying IVF benefits to gay men in same-sex relationships have each incurred tens of thousands of dollars of out-of-pocket expenses that single women, women in different-sex or same-sex relationships, and men in different-sex relationships were not required to bear. But sadly, many couples who would have availed themselves of IVF benefits if the City of New York had not denied IVF benefits to gay men have now abandoned their plans to have biological children altogether, forever extinguishing their dreams of becoming parents to biological children.

80.     The City of New York, Mayor Adams, Commissioner Campion, former Mayor de Blasio, and former Commissioner Linn have long been aware that gay male City employees in same-sex relationships have been and continue to be denied access to IVF benefits that otherwise are provided to single women, women in different-sex or same-sex relationships, and men in different-sex relationships. But the City of New York, Mayor Adams, Commissioner Campion, former Mayor de Blasio, and former Commissioner Linn have refused to reform the City of New York's policies to provide gay male City employees in same-sex relationships equal access to IVF, even after Mr. Briskin and Mr. Maggipinto contacted OLR and the City's Corporation Counsel in 2021, and even after Mr. Briskin and Mr. Maggipinto filed a class action discrimination charge with the EEOC challenging the City's policy or practice in April 2022.

**E. By Denying Gay Men Equal Access to IVF, the City of New York Has Discriminated Based on Sex and Sexual Orientation in Violation of Federal, State, and Local Law, and the United States and New York Constitutions.**

81.     Title VII of the Civil Rights Act and the New York State and City Human Rights Laws prohibit employers like the City of New York from discriminating against employees in the terms, conditions, and privileges of employment based on their sex or sexual orientation. 42 U.S.C. § 2000e-2(a); N.Y. Exec. Law 296(1)(a); N.Y.C. Admin Code § 8-107(1)(a). As the U.S. Supreme Court held in *Bostock*, an employer who discriminates against an employee based on the employee's sexual orientation necessarily engages in unlawful sex discrimination in violation of Title VII. 590 U.S. at 649. These federal, state, and local employment discrimination statutes prohibit both intentional discrimination and policies or practices that have an unjustified disparate impact based on sex or sexual orientation. *See* 42 U.S.C. § 2000e-2(a), (k); N.Y. Exec. Law 296(1)(a); N.Y.C. Admin Code § 8-107(1)(a), (17).

82.     The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and Article I, Sections 6 and 11 of the New York Constitution prohibit municipalities like the City of New York from denying equal protection under the law and denying liberty without due process. These prohibitions make it unlawful for the government to discriminate on the basis of sex or sexual orientation and, in particular, to deny government benefits and other liberty interests to same-sex married couples on the basis of their sexual orientation. *See Obergefell v. Hodges*, 576 U.S. 644, 675-76 (2015); *United States v. Windsor*, 570 U.S. 744, 775 (2013).

83.     The City's policy or practice of denying IVF benefits to gay male employees and their partners in same-sex relationships and single gay male employees, while providing IVF access to single female employees, women in different-sex or same-sex relationships, and men in different-sex relationships, constitutes intentional discrimination based on sex and sexual orientation. Thus, the City's policy or practice violates Title VII, the New York State and City Human Rights Laws,

and the Equal Protection and Due Process Clauses of the United States and New York Constitutions.

84.    The City's policy or practice is a sex- and sexual orientation-based classification because gay men, including those in same-sex relationships, would be permitted access to IVF under the City's healthcare plan if their sex were different (*i.e.*, female) or if their sexual orientation were different (*i.e.*, heterosexual).

85.    In addition, the City of New York's policy or practice advances sex- and sexual orientation-based stereotypes that gay male couples and single gay men are *not* fit to be parents, while single women, women in different-sex or same-sex relationships, and men in different-sex relationships *are* fit to be parents.

86.    The City of New York's policy or practice also discriminates against gay men because of their association with people of the same sex.

## CLASS ACTION ALLEGATIONS

87.    Plaintiffs Corey Briskin and Nicholas Maggipinto bring this action as a proposed class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the following "Employees and Spouses Class":

> All gay men who, on or after May 9, 2021, through the date of judgment in this action: (1) (a) were current or former employees of the City of New York and were eligible to participate in a healthcare plan of the City of New York, or (b) were a male spouse of a gay male current or former employee of the City of New York and were eligible to participate in a healthcare plan of the City of New York; (2) were interested in using in vitro fertilization ("IVF") or in obtaining reimbursement for themselves or their spouses for IVF from a healthcare plan of the City of New York, or sought such benefits or reimbursement for IVF; and (3) were denied access to IVF under such a healthcare plan for themselves or their spouses, or were not eligible to access IVF under such a healthcare plan for themselves or their spouses, because they are (or at the relevant time were) gay men in a same-sex relationship or single gay men.

25

88.     Plaintiff Corey Briskin brings this action as a proposed class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the following "City Employees Class":

> All gay men who, on or after April 12, 2019, through the date of judgment in this action: (1) were employed by the City of New York; (2) were interested in using in vitro fertilization ("IVF") or in obtaining reimbursement for themselves or their spouses for IVF from a healthcare plan of the City of New York, or sought such benefits or reimbursement for IVF; and (3) were denied access to IVF under such a healthcare plan for themselves or their spouses or were not eligible to access IVF under such a healthcare plan for themselves or their spouses, because they are (or at the relevant time were) gay men in a same-sex relationship or single gay men.

## A. Rule 23(a) is satisfied.

89.     The members of the proposed Classes are so numerous that joinder of all members is impracticable. There are at least hundreds—and possibly thousands—of people who are members of each proposed Class.

90.     There are at least several questions of law and fact common to all members of the proposed Classes, including:

  a. Whether the City of New York has a policy or practice of denying single gay men and gay men in same-sex relationships IVF coverage while providing IVF coverage to single women, women in different-sex or same-sex relationships, and men in different-sex relationships;

  b. Whether the City of New York's policy or practice constitutes unlawful sex- and/or sexual orientation-based discrimination in violation of federal, state, and local law, including the Fourteenth Amendment of the United States Constitution; Article I, Sections 6 and 11 of the New York Constitution; Title VII of the Civil Rights Act of 1964; the New York State Human Rights Law; and the New York City Human Rights Law;

  c.   What types and amounts of damages the City of New York owes to each member of the Classes;

  d.   What injunctive relief should be awarded; and

  e.   Whether attorneys' fees and costs should be awarded?

91.   Plaintiffs' claims are typical of the claims of the Classes they seek to represent because, during the relevant period as to each Class, Plaintiffs and the Class Members (1) were single gay men or gay men in same-sex relationships; (2) were interested in accessing IVF under a healthcare plan of the City of New York or in obtaining reimbursement for IVF under a healthcare plan of the City of New York, or sought such access or reimbursement for IVF; and (3) were denied such access or otherwise were ineligible to access IVF or receive such reimbursement under such a health plan because they were single gay men or gay men in same-sex relationships. Accordingly, Plaintiffs' claims arise from the same pattern or practice or course of conduct that forms the basis of the claims of the members of the Classes.

92.   In addition, Plaintiff Briskin brings the same claims for violations of federal, state, and local employment discrimination laws based on the same legal theory as the other members of the City Employees Class, and Plaintiffs Briskin and Maggipinto bring the same claims for violations of the Equal Protection and Due Process Clauses of the United States Constitution and the New York Constitution based on the same legal theory as the other members of the Employees and Spouses Class.

93.   Both Plaintiffs and their counsel will fairly and adequately represent the Classes. There is no antagonism between the interests of Plaintiffs and those of Class Members. There is no conflict between Plaintiffs' claims and those of Class Members. Plaintiffs have retained counsel who are skilled and experienced in civil rights and class action litigation and who will vigorously prosecute this litigation, including the former General Counsel of the EEOC.

**B.  Rule 23(b)(3) certification is appropriate.**

94.     Class certification is appropriate for the proposed Classes under Rule 23(b)(3) of the Federal Rules of Civil Procedure. The common questions of fact and law, described above, predominate over any questions affecting only individual Class Members, including whether the City of New York violated Class Members' constitutional and statutory rights and continues to unlawfully discriminate based on sex and sexual orientation, and the relief that Plaintiffs and Class Members seek.

95.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

96.     First, Class Members do not have an interest in individually controlling the prosecution of separate actions because their individual damages are unlikely to be large enough to warrant pursuing individual litigation in court or to obtain counsel to pursue an individual action, and because the cost of litigating the action will far exceed any potential benefit for individual Class Members. The prosecution of separate actions by individual Class Members would also impose heavy burdens on the courts and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the proposed Classes, including the key legal question of whether the City's policy or practice constitutes unlawful sex or sexual orientation discrimination. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure the uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

97.     Second, Plaintiffs and their counsel are unaware of any other litigation by Class Members against the City of New York or the other Defendants regarding the policy or practice challenged in this action.

98.     Third, it is desirable to concentrate the litigation of these claims in this forum, because a large portion of Class Members work and/or reside in this District, and venue is proper in this District.

99.     There will be no difficulty managing this action as a class action.

**FIRST CLAIM FOR RELIEF**
**Plaintiff Briskin on behalf of himself and the other members of the**
**City Employees Class against the City of New York**
**Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000e-2(a)**

100.     Plaintiff Briskin, on behalf of himself and the other members of the City Employees Class, incorporates by reference all preceding paragraphs.

101.     Plaintiff Briskin brings this claim under Title VII of the Civil Rights Act against the City of New York on behalf of himself and other members of the City Employees Class.

102.     Defendant City of New York is an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b).

103.     Plaintiff Briskin and the other members of the City Employees Class are employees within the meaning of Title VII, 42 U.S.C. § 2000e(f), in that they have been employed by an employer, Defendant City of New York.

104.     Title VII makes it unlawful for an employer to "discriminate against an individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).

105.     Title VII also makes it unlawful for an employer "to limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(2).

106.    Discrimination based on an employee's sexual orientation is an unlawful form of sex discrimination under Title VII. *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 662 (2020).

107.    As described above, the City's policy or practice of denying IVF benefits to male employees in same-sex relationships, their gay male partners, and single gay male employees, while providing IVF access to single female employees, female employees in different-sex or same-sex relationships and their partners, and male employees in different-sex relationships and their partners, constitutes intentional discrimination against Plaintiff Briskin and the other members of the City Employees Class in compensation, terms, conditions, or privileges of employment based on sex and sexual orientation, as well as intentional discrimination in limiting, segregating, or classifying employees in a way that deprives them of employment opportunities and adversely affects their status as employees because of their sex.

108.    As described above, the City's policy or practice constitutes an unlawful sex- and sexual orientation-based classification and is based on sex- and sexual orientation-based stereotypes.

109.    The City's policy or practice also constitutes unlawful disparate impact discrimination based on sex because the City's policy or practice disproportionately denies IVF access to male employees in same-sex relationships and their partners compared to single female employees, female employees in different-sex or same-sex relationships and their partners, and male employees in different-sex relationships and their partners. It also disproportionately denies IVF access to single gay men compared to single women.

110.    This statistically significant disparity between the treatment of gay men and other similarly situated employees and their partners cannot be justified by business necessity. In fact, the City cannot identify any legitimate non-discriminatory reason for denying IVF benefits only to male employees in same-sex relationships and their partners and single gay male employees.

111.    Plaintiff Briskin and other members of the City Employees Class have been harmed by the City's violations of Title VII, including being denied valuable healthcare benefits that they needed to grow their families, delaying their plans to grow their families, and experiencing stigmatic injury from such disparate treatment.

112.    The City's violations were intentional, knowing, and reckless with respect to the civil rights of Plaintiff Briskin and the other members of the City Employees Class.

113.    Plaintiff Briskin and the other members of the City Employees Class seek all available damages, equitable relief, and attorneys' fees and costs related to this lawsuit and the City of New York's violations of Title VII of the Civil Rights Act.

**SECOND CLAIM FOR RELIEF**
**Plaintiff Briskin on behalf of himself and the other members of**
**the City Employees Class against the City of New York**
**New York State Human Rights Law**
**N.Y. Exec. Law § 296(a)**

114.    Plaintiff Briskin, on behalf of himself and the other members of the City Employees Class, incorporates by reference all preceding paragraphs.

115.    Plaintiff Briskin brings this claim under the New York State Human Rights Law against the City of New York on behalf of himself and other members of the City Employees Class.

116.    Defendant City of New York is an employer within the meaning of the New York State Human Rights Law, N.Y. Exec. Law § 292(5).

117.    Plaintiff Briskin and the other members of the City Employees Class are employees within the meaning of the New York State Human Rights Law, N.Y. Exec. Law § 292(6), as they have been employed by an employer, the City of New York.

118.    The New York State Human Rights Law makes it unlawful for an employer "to discriminate against such individual in compensation or in terms, conditions or privileges of employment" based on sex, gender, or sexual orientation. N.Y. Exec. Law § 296(a). This provision

prohibits intentional discrimination based on sex and sexual orientation, as well as disparate impact discrimination.

119.    As described above, the City's policy or practice of denying IVF benefits to male employees in same-sex relationships, their partners, and single gay male employees, while providing IVF benefits to single female employees, female employees in different-sex or same-sex relationships and their partners, and male employees in different-sex relationships and their partners, constitutes intentional discrimination against Plaintiff Briskin and the other members of the City Employees Class in compensation, terms, conditions, or privileges of employment based on sex, gender, and sexual orientation, as well as intentional discrimination in limiting, segregating, or classifying employees in a way that deprives them of employment opportunities and adversely affects their status as employees because of their sex.

120.    As described above, the City's policy or practice constitutes an unlawful sex- or gender-based classification and is based on sex- and gender-based stereotypes.

121.    The City's policy or practice also constitutes unlawful disparate impact discrimination based on sex, gender, and sexual orientation, because the City's policy or practice disproportionately denies IVF access to male employees in same-sex relationships and their partners compared to single female employees, female employees in different-sex or same-sex relationships and their partners, and male employees in different-sex relationships and their partners. It also disproportionately denies IVF access to gay males compared to single women.

122.    This statistically significant disparity between the treatment of gay men and other similarly situated employees and their partners cannot be justified by business necessity. In fact, the City cannot identify any legitimate non-discriminatory reason for denying IVF benefits only to gay male employees in same-sex relationships and their partners and single gay male employees.

123.    Plaintiff Briskin and the other members of the City Employees Class have been harmed by the City's violations of Title the New York State Human Rights Law, including being denied valuable healthcare benefits that they needed to grow their families, delaying their plans to grow their families, and experiencing stigmatic injury from such disparate treatment.

124.    The City's violations were intentional, knowing, and reckless with respect to the civil rights of Plaintiff Briskin and the other members of the City Employees Class.

125.    Plaintiff Briskin and the other members of the City Employees Class seek all available damages, equitable relief, and attorneys' fees and costs related to this lawsuit and the City's violations of the New York State Human Rights Law.

### THIRD CLAIM FOR RELIEF
**Plaintiff Briskin on behalf of himself and the other members
of the City Employees Class against the City of New York
New York City Human Rights Law
N.Y.C. Admin. Code § 8-107**

126.    Plaintiff Briskin, on behalf of himself and the other members of the City Employees Class, incorporates by reference all preceding paragraphs.

127.    Plaintiff Briskin brings this claim under the New York City Human Rights Law against the City of New York on behalf of himself and other members of the City Employees Class.

128.    Defendant City of New York is an employer within the meaning of the New York City Human Rights Law, N.Y.C. Admin. Code § 8-102.

129.    The New York City Human Rights Law makes it unlawful for an employer "[t]o discriminate against [a] person in compensation or in terms, conditions or privileges of employment" on the basis of gender or sexual orientation. N.Y.C. Admin. Code § 8-107(1)(a)(3). This provision prohibits intentional discrimination based on sex and sexual orientation, as well as disparate impact discrimination in conjunction with N.Y.C. Admin. Code § 8-107(17).

130.    As described above, the City's policy or practice of denying IVF benefits to male employees in same-sex relationships, their partners, and single gay male employees, while providing IVF access to single female employees, female employees in different-sex or same-sex relationships and their partners, and male employees in different-sex relationships and their partners, constitutes intentional discrimination against Plaintiff Briskin and the other members of the City Employees Class in compensation, terms, conditions, or privileges of employment based on gender and sexual orientation, as well as intentional discrimination in limiting, segregating, or classifying employees in a way that deprives them of employment opportunities and adversely affects their status as employees because of their gender and sexual orientation.

131.    As described above, the City's policy or practice constitutes an unlawful gender- and sexual orientation-based classification and is based on gender- and sexual orientation-based stereotypes.

132.    The City's policy or practice also constitutes unlawful disparate impact discrimination based on gender and sexual orientation, because the City's policy or practice disproportionately denies IVF access to male employees in same-sex relationships and their partners compared to single female employees, female employees in different-sex or same-sex relationships and their partners, and male employees in different-sex relationships and their partners. It also disproportionately denies IVF access to gay men compared to single women.

133.    This statistically significant disparity between the treatment of gay men and other similarly situated employees and their partners cannot be justified by business necessity. In fact, the City cannot identify any legitimate non-discriminatory reason for denying IVF benefits only to gay male employees in same-sex relationships and their partners and single gay male employees, let alone that the policy or practice bears a significant relationship to a significant business objective of the City.

134.    Plaintiff Briskin and the other members of the City Employees Class have been harmed by the City's violations of the New York City Human Rights Law, including being denied valuable healthcare benefits that they needed to grow their families, delaying their plans to grow their families, and experiencing stigmatic injury from such disparate treatment.

135.    The City's violations were intentional, knowing, and reckless with respect to the civil rights of Plaintiff Briskin and the other members of the City Employees Class.

136.    Plaintiff Briskin and the other members of the City Employees Class seek all available damages, equitable relief, and attorneys' fees and costs related to this lawsuit and the City's violations of the New York City Human Rights Law.

**FOURTH CLAIM FOR RELIEF**
**Plaintiffs Briskin and Maggipinto on behalf of themselves and the other members**
**of the Employees and Spouses Class against All Defendants**
**Equal Protection and Due Process Clauses of the Fourteenth Amendment**
**of the U.S. Constitution and 42 U.S.C. § 1983**

137.    Plaintiffs Briskin and Maggipinto, on behalf of themselves and the other members of the Employees and Spouses Class, incorporate by reference all preceding paragraphs.

138.    Plaintiffs Briskin and Maggipinto bring this claim under the Equal Protection and Due Process Clauses of the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983 against all Defendants on behalf of themselves and other members of the Employees and Spouses Class.

139.    Defendants City of New York, Mayor Eric L. Adams, OLR Commissioner Renee Campion, former Mayor Bill de Blasio, and former OLR Commissioner Robert Linn, as policymakers of the City of New York, have adopted and implemented a formal policy and engaged in a pattern, practice, or widespread custom of denying IVF benefits to gay male employees, their gay male partners, and single gay male employees, while providing IVF benefits

to single female employees, female employees with different- or same-sex partners and their partners, and male employees with different-sex partners and their partners.

140.   This policy or practice constitutes intentional discrimination against Plaintiffs Briskin and Maggipinto, and the other members of the Employees and Spouses Class based on their sex, sexual orientation, or their relationship or association with their same-sex male partners in violation of the Equal Protection and Due Process Clauses of the Fourteenth Amendment of the United States Constitution.

141.   The Fourteenth Amendment to the United States Constitution provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

142.   The Equal Protection Clause prohibits the government and government officials from denying equal treatment based on sex or sexual orientation.

143.   The Fourteenth Amendment also incorporates and applies to states and municipalities the Due Process Clause of the Fifth Amendment of the United States Constitution, which provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

144.   The Due Process Clause prohibits the government and government officials from discriminating against same-sex married couples and single gay men on the basis of their sexual orientation.

145.   As described above, the City has adopted a policy or practice that facially discriminates against gay men based on their sex and sexual orientation by categorically denying gay men in same-sex relationships and single gay men—but not single women, women in different-sex or same-sex relationships, or male employees in different-sex relationships—IVF benefits as employees or qualified dependents of employees of the City.

146. Defendants' actions were deliberate, reckless, and indifferent to the constitutional rights of Plaintiffs Briskin and Maggipinto and the other members of the Employees and Spouses Class.

147. Defendants Mayor Eric L. Adams, OLR Commissioner Renee Campion, former Mayor Bill de Blasio, and former OLR Commissioner Robert Linn, the policymakers responsible for the City's formal policy and pattern, practice, or custom, were deliberately indifferent to the clearly established constitutional rights of Plaintiffs Briskin and Maggipinto and the other members of the Employees and Spouses Class. By 2015, long before Plaintiffs or the other members of the Employees and Spouses Class sought IVF benefits from the City, it was clearly established that a municipality cannot treat a person differently because they are married to a person of the same sex or associate with a person of the same sex. And by June 2020, it was likewise clearly established that discrimination based on sex, which the Fourteenth Amendment prohibits, includes discrimination against gay men on the basis of their sexual orientation or their association with people of the same sex.

148. Plaintiffs Briskin and Maggipinto and the other members of the Employees and Spouses Class have been harmed by the Defendants' violations of the United States Constitution, including being denied valuable healthcare benefits that they needed to grow their families, delaying their plans to grow their families, and experiencing stigmatic injury from such disparate treatment.

149. Plaintiffs Briskin and Maggipinto and the other members of the Employees and Spouses Class seek all available damages, equitable relief, and attorneys' fees and costs related to this lawsuit and the City's violations of the United States Constitution, including under 42 U.S.C. § 1988.

**FIFTH CLAIM FOR RELIEF**
**Plaintiffs Briskin and Maggipinto on behalf of themselves and the other**
**members of the Employees and Spouses Class against All Defendants**
**Equal Protection and Due Process Clauses of the New York Constitution**

150.   Plaintiffs Briskin and Maggipinto, on behalf of themselves and the other members of the Employees and Spouses Class, incorporate by reference all preceding paragraphs.

151.   Plaintiffs Briskin and Maggipinto bring this claim under the Equal Protection and Due Process Clauses of the New York State Constitution against all Defendants on behalf of themselves and other members of the Employees and Spouses Class.

152.   Defendants City of New York, Mayor Eric L. Adams, OLR Commissioner Renee Campion, former Mayor Bill de Blasio, and former OLR Commissioner Robert Linn, as policymakers of the City of New York, have adopted and implemented a formal policy and engaged in a pattern, practice, or widespread custom of denying IVF benefits to gay male employees, their partners, and single gay male employees, while providing IVF benefits to single female employees, female employees with different- or same-sex partners and their partners, and male employees with different-sex partners and their partners.

153.   This policy or practice constitutes intentional discrimination against Plaintiffs Briskin and Maggipinto and the other members of the Employees and Spouses Class based on their sex, sexual orientation, or their relationship or association with a same-sex male partner in violation of the Equal Protection and Due Process Clauses of the New York Constitution.

154.   Article I, Section 11 of the New York Constitution provides that "[n]o person shall be denied the equal protection of the laws of this state or any subdivision thereof." N.Y. Const. art. 1, § 11.

155.   Article I, Section 6 of the New York Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law." N.Y. Const. art. 1, § 6.

156.    The Equal Protection and Due Process Clauses of the New York Constitution are ordinarily interpreted by New York State courts to be at least as protective as the Equal Protection and Due Process Clauses of the United States Constitution, *see Brown v. State*, 89 N.Y.2d 172, 190 (N.Y. 1996) (equal protection); *People v. Hoff*, 487 N.Y.S.2d 851, 852 (2nd Dep't 1985) (due process), and accordingly prohibit the City of New York from denying equal treatment based on sex or sexual orientation and from discriminating against same-sex married couples and single gay men on the basis of their sex or sexual orientation.

157.    As described above, the City has adopted a policy that facially discriminates against gay men based on their sex and sexual orientation by categorically denying gay men in same-sex relationships and single gay men—but not single female employees, female employees in different-sex or same-sex relationships and their partners, or male employees in different-sex relationships and their partners—IVF benefits as employees or qualified dependents of employees of the City.

158.    Defendants' actions were deliberate, reckless, and indifferent to the state constitutional rights of Plaintiffs Briskin and Maggipinto and the other members of the Employees and Spouses Class.

159.    Defendants Mayor Eric L. Adams, OLR Commissioner Renee Campion, former Mayor Bill de Blasio, and former OLR Commissioner Robert Linn, the policymakers responsible for the City's formal policy and pattern, practice, or custom, were deliberately indifferent to the clearly established state constitutional rights of Plaintiffs Briskin and Maggipinto and the other members of the Employees and Spouses Class.

160.    Plaintiffs Briskin and Maggipinto and the other members of the Employees and Spouses Class have been harmed by the City's violations of the New York State Constitution, including being denied valuable healthcare benefits that they needed to grow their families,

delaying their plans to grow their families, and experiencing stigmatic injury from such disparate treatment.

161.    Plaintiffs Briskin and Maggipinto and the other members of the Employees and Spouses Class seek all available damages, equitable relief, and attorneys' fees and costs related to this lawsuit and the City's violations of the New York Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and Class Members pray for relief as follows:

(i)     A declaratory judgment that Defendants violated Title VII of the Civil Rights Act, the New York State Human Rights Law, the New York City Human Rights Law, the United States Constitution, and the New York Constitution;

(ii)    A preliminary and permanent injunction against Defendants City of New York, Mayor Adams, and OLR Commissioner Campion, requiring them to comply with Title VII of the Civil Rights Act, the New York State Human Rights Law, the New York City Human Rights Law, the United States Constitution, and the New York Constitution when providing IVF benefits to employees of the City of New York and their qualified dependents;

(iii)   Certification of the case as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

(iv)    Designation of Plaintiffs Briskin and Maggipinto as the representatives of the Employees and Spouses Class and designation of Plaintiff Briskin as the representative of the City Employees Class;

(v)     Designation of Plaintiffs' counsel as Class Counsel;

(vi)    An order forbidding Defendants City of New York, Mayor Adams, and OLR Commissioner Campion from engaging in any further violations of Title VII of the Civil Rights Act, the New York State Human Rights Law, the New York City Human Rights Law, the United States Constitution, and the New York Constitution when providing IVF benefits to employees of the City of New York and their qualified dependents;

(vii)   An award of damages for the economic and non-economic injuries caused by Defendants' unlawful conduct, any other compensatory damages, and punitive damages;

(viii)  Reasonable attorneys' fees, costs, and expert costs incurred herein, to the extent allowable by law;

(ix)     Pre- and post-judgment interest, as provided by law;

(x)      Payment of a reasonable service award to the named Plaintiffs in recognition of the services they have rendered and will continue to render to Class Members; and

(xi)     Such other and further equitable relief, including nominal damages, as this Court deems necessary, just, and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: May 9, 2024                         Respectfully submitted,

_/s/ Peter Romer-Friedman_
Peter Romer-Friedman
Patrick David Lopez (_pro hac motion forthcoming_)
PETER ROMER-FRIEDMAN LAW PLLC
1629 K Street NW
Suite 300
Washington, DC 20006
Tel.: (202) 355-6364
Email: peter@prf-law.com

_Attorneys for the Plaintiffs and Proposed Classes_

# EXHIBIT A

U.S. Department of Justice

Civil Rights Division

NOTICE OF RIGHT TO SUE WITHIN 90 DAYS

VIA EMAIL

*150 M Street, N.E.*
*Karen Ferguson , EMP, 4CON, Room 9.514*
*Washington, DC 20530*

March 07, 2024

Mr. Nicholas Maggipinto & Corey Briskin, et al.
c/o Peter Romer-Friedman, Esquire
Peter Romer-Friedman Law
1629 K Street NW
Suite 300
Washington, DC  20006

Re:  EEOC Charge Against City of New York, et al.
      No. 520202204727

Dear Mr. Corey Briskin, et al.:

   Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

   If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

   The investigative file pertaining to your case is located in the EEOC New York District Office, New York, NY.

   This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

                        Sincerely,


                        Kristen Clarke
                        Assistant Attorney General
                        Civil Rights Division


                  by        /s/ Karen L. Ferguson
                        Karen L. Ferguson
                        Supervisory Civil Rights Analyst
                        Employment Litigation Section


cc: New York District Office, EEOC
    City of New York, et al.